UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MORRIS ANTHONY GREENBERG,

Petitioner,

v.

PATRICK COVELLO, Warden,

Respondent.

No.  2:19-cv-2238 DAD AC

ORDER AND

FINDINGS AND RECOMMENDATIONS

Petitioner is a California state prisoner proceeding through counsel with an application for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  This action proceeds on the petition filed on November 6, 2019, ECF No. 1, which challenges petitioner's 2012 conviction for first degree murder.  Respondent has answered, ECF No. 11, and petitioner has filed a traverse, ECF No. 17.  Upon careful consideration of the record and the applicable law, the undersigned recommends granting habeas relief based on trial counsel's failure to investigate and present a mental health defense at trial.

## BACKGROUND

I.      Procedural History

A.      Pretrial Proceedings

On July 20, 2008, petitioner fatally shot Anthony Dumont and then shot himself.  Two days later he was charged in a criminal complaint with Dumont's murder, with a special

1

1   allegation that he personally discharged a firearm causing great bodily injury and death.  ECF No.

2   12-15 at 38 (Clerk's Transcript).  While petitioner was still hospitalized, the Public Defender's

3   Office was appointed to represent him.  ECF No. 12-15 at 40 (Minute Order).  On July 22, 2008,

4   arraignment was continued and Eugene P. Roeder, Ph.D., was appointed to conduct an evaluation

5   of petitioner.  ECF No. 12-15 at 40-42.  Dr. Roeder was appointed pursuant to California

6   Evidence Code § 1017(a), id. at 42, which provides for a confidential report to defense counsel

7   intended to "provide the lawyer with information needed so that he or she may advise the

8   defendant whether… to present a defense based on his or her mental or emotional condition."  Dr.

9   Roeder never evaluated petitioner.

10      On January 13, 2009, the criminal complaint was amended to add a second count for

11   assaulting Renee Romanko with a firearm.[1]  ECF No. 12-15 at 82-83 (Amended Criminal

12   Complaint).  On February 2, 2009, petitioner was arraigned on an information charging the

13   murder of Dumont and the assault of Romanko.  ECF No. 12-15 at 97.

14      On December 17, 2010, the Public Defender's Office was relieved as counsel and

15   petitioner was appointed a new attorney who ultimately represented him at trial.  ECF No. 12-15

16   at 177 (Minute Order).  Trial began on November 21, 2022.  I RT 97 (ECF No. 12-18 at 129).

17          B.      Trial

18      The jury was presented with evidence of the following facts.[2]  Petitioner is a former police

19   officer.  He married his wife, Barrie, in 1997, a year after beginning his employment as a police

20   officer.  The couple had a daughter two years later, and they bought a home in El Dorado County

21   in 2006.  Petitioner went on disability retirement in 2007 due to neck injuries.

22      By July of 2008, the family home was in foreclosure and listed for sale.  The couple

23   separated in May and petitioner's wife began dating Anthony Dumont, the victim.  Petitioner

24   testified that he went to the shop where Dumont worked and told him to stop seeing his wife

---

[1] Romanko, Dumant's sister, was present at the scene of the homicide.
[2] This summary is adapted from the opinion of the California Court of Appeal on direct review.
ECF No. 12-1 (Direct Appeal Opinion) at 2-7.  The undersigned finds this summary to be
accurate.

because he wanted to work on the marriage.  Petitioner also warned his wife to stop seeing Dumont, and said that if she did not, she would be sorry.  Over the summer the couple moved items from the home to their separate residences.  One morning a friend helped petitioner move a trailer away from the house; Barrie said she would be moving items with friends that day and petitioner did not want her using the trailer.  Petitioner had breakfast with his daughter, took some things from the house to his apartment, and then returned to the house.

When petitioner arrived at the house at about 1:40 p.m., his wife was there with Dumont and Dumont's sister, Renee Romanko, and brother-in-law.  Petitioner was angry that they had loaded a refrigerator and other items onto a trailer parked in front of the house.  Petitioner saw Dumont apparently disassembling a roof in the horse corral area and told him, "Get the fuck off the property."  Petitioner then walked into the house, used the "command presence" he had learned as a police officer, and insisted that the others "get the fuck out of the house."  Barrie protested that she needed help to move her things, but the visitors went outside and prepared to leave as petitioner directed.

As Romanko walked outside, she saw the victim walk from the horse corral toward the passenger side of her truck.  There were no firearms in the truck and Dumont was not carrying a gun.  Dumont's brother-in-law began to get into the driver's seat of the truck beside him, but he remembered his tools and returned to the house to fetch them.  At the same time, an argument between petitioner and his wife escalated and Barrie asked Dumont's sister to walk their daughter back into the house.  The child was crying and saying she "didn't want daddy to do this," and "didn't want anybody to go to jail."  Dumont was quietly sitting in his sister's truck.  Petitioner angrily repeated his order for the victim to leave; the victim said he was just waiting for his brother-in-law.

As petitioner and his wife stood near the trailer attached to her truck, he accused her of taking the property in the trailer without his permission and threatened to call the sheriff; his wife replied, "Go ahead and do it."  She asked him, "Why do you have to make this so ugly?"  Striding toward his parked Mercedes, petitioner said he would show her ugly.  Petitioner's car was parked about 100 feet from the house.  When he got to the car, he reached into the passenger side,

3

bending toward the dashboard.  The victim's brother-in-law testified that less than a minute passed from when he heard Barrie telling petitioner to go ahead and call the sheriff until he heard the sound of gunfire.

Petitioner said his gun was already in his waistband; he said he retrieved a cell phone from his car but could not get a signal.  When petitioner returned from his car, his wife had walked from the trailer to where Dumont was sitting.  She said petitioner had his hand down and his arm behind his leg as he approached.  He stepped between her and Dumont inside the open truck door, lifted his arm and shot the victim twice in the chest.  Barrie dropped to the ground begging not to be hurt.  Petitioner stepped back and shot the victim in the head.  Petitioner then shot himself under the chin.  His wife ran into the house, grabbed her daughter, and fled out the back door to call 911 from a neighbor's house.

The victim died from multiple gunshot wounds.

Petitioner claimed self-defense, imperfect self-defense, and/or sudden argument or heat of passion.  Petitioner said he knew that Dumont sometimes carried a concealed weapon.  He acknowledged that he saw nothing in Dumont's hands and no bulge in his clothing when Dumont (who was wearing shorts and a tank top) walked to the truck.  Petitioner claimed that when he was two or three feet away and inside the open truck door, he saw the victim reach under the seat and retrieve a black gun.  Petitioner pulled his own gun from his waistband and started firing.  He said he was scared and twice warned the victim to show his hands.  When he looked for a gun as the victim slumped down on his left side, there was no gun.

C.     Verdict and Sentence

The jury convicted petitioner of first degree murder and found the firearm enhancements to be true.  ECF No. 12-17 at 85-86 (Verdict Forms).  Petitioner was acquitted of assaulting Renee Romanko.  ECF No. 12-17 at 87-88.  The trial court sentenced petitioner to a total term of 50 years to life.  ECF No. 12-17 at 243-244 (Abstract of Judgment).

D.     Direct Appeal

Petitioner timely appealed, and the California Court of Appeal affirmed the judgment of conviction on February 4, 2015.  ECF No. 12-1.  The California Supreme Court denied review on

4

1    May 13, 2015.  ECF No. 12-6.

2         E.        State Post-Conviction Proceedings

3              1.    Superior Court Habeas Proceedings

4         Petitioner filed a petition for writ of habeas corpus in the El Dorado County Superior

5    Court on July 12, 2016, claiming that trial counsel rendered ineffective assistance.  The petition

6    alleged three instances of ineffective assistance, including that counsel was ineffective for failing

7    to have Dr. Roeder conduct a psychological evaluation of petitioner and to present this mental

8    health evidence in support of self-defense.  ECF No. 12-7.  The superior court issued an Order to

9    Show Cause limited to that claim, ECF No. 12-8, and held an evidentiary hearing on August 28

10   and 29, 2018.  The evidence presented at the hearing is detailed below, in relation to Claim One.

11   It included the testimony of trial counsel, an attorney expert, and a mental health expert.  The

12   court denied the petition by written order dated April 3, 2019.  ECF No. 12-12.

13              2.   California Supreme Court Habeas Petition

14        Petitioner then filed an original habeas petition in the California Supreme Court, which

15   contained the same three ineffective assistance of counsel claims.  ECF No. 12-13.  This petition

16   supplemented the evidentiary record with a new declaration from Dr. Berg, petitioner's mental

17   health expert, that expressly addressed the superior court's reasoning for denying relief.  The

18   California Supreme Court denied petitioner's habeas application without comment or citation to

19   authority on October 9, 2019.  ECF No. 12-14.

20              3.   Federal Habeas Petition

21        Petitioner presents four claims for relief in the instant § 2254 petition.  First, petitioner

22   contends that he received ineffective assistance of counsel for failing to investigate and present a

23   mental health defense to establish that petitioner suffered from PTSD as a former police officer.

24   ECF No. 1-1 at 1-15.  Next, petitioner asserts that "trial counsel was ineffective for failing to

25   investigate and consult with a forensics expert to supplement or supplant the inadequate crime

26   scene reconstruction expert used at trial."  ECF No. 1-1 at 16-19.  In his third claim for relief,

27   petitioner challenges his trial counsel's failure to investigate and interview three character

28   witnesses who knew both petitioner and his wife.  ECF No. 1-1 at 19-20.  Lastly, petitioner

contends that the trial court's refusal to admit testimony of two defense experts violated his Sixth

Amendment right to present a defense.  ECF No. 1-1 at 24-28.

II.      AEDPA STANDARDS GOVERNING HABEAS RELIEF

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), provides in relevant part as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The statute applies whenever the state court has denied a federal claim on its merits,

whether or not the state court explained its reasons.  Harrington v. Richter, 562 U.S. 86, 99

(2011).  State court rejection of a federal claim will be presumed to have been on the merits

absent any indication or state-law procedural principles to the contrary.  Id. (citing Harris v. Reed,

489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a

decision appearing to rest on federal grounds was decided on another basis)).  "The presumption

may be overcome when there is reason to think some other explanation for the state court's

decision is more likely."  Id. at 99-100.

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal

principle or principles" previously articulated by the Supreme Court.  Lockyer v. Andrade, 538

U.S. 63, 71-72 (2003).  Only Supreme Court precedent may constitute "clearly established

Federal law," but courts may look to circuit law "to ascertain whether…the particular point in

issue is clearly established by Supreme Court precedent."  Marshall v. Rodgers, 569 U.S. 58, 64

(2013).

A state court decision is "contrary to" clearly established federal law if the decision

"contradicts the governing law set forth in [the Supreme Court's] cases."  Williams v. Taylor, 529

U.S. 362, 405 (2000).  A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407-08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003).

Relief is also available under the AEDPA where the state court predicates its adjudication of a claim on an unreasonable factual determination.  28 U.S.C. § 2254(d)(2).  The statute explicitly limits this inquiry to the evidence that was before the state court.  See also Cullen v. Pinholster, 563 U.S. 170 (2011).  Under § 2254(d)(2), factual findings of a state court are presumed to be correct subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the same record could not abide by the state court factual determination.  A petitioner must show clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

If petitioner meets either of the 28 U.S.C. § 2254(d) standards, then the federal habeas court reviews the merits of the constitutional claim under pre-AEDPA standards in order to be entitled to relief.  Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc).  While there is no required order in which these two inquiries must be conducted, federal habeas courts generally apply Section 2254(d) analysis first because it is a high hurdle for petitioners to overcome. In applying these standards, federal courts review the last reasoned state court decision on each claim for relief.  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  Ylst, 501 U.S. at 803; see also Gill v. Ayers, 342 F.3d 911, 917 n. 5 (9th Cir. 2003) (explaining that federal courts "look through" unexplained rulings of higher state courts to the last reasoned decision).

III.    DISCUSSION

    A.    Claim One: Ineffective Assistance for Failing to Investigate and Present Petitioner's Mental Health as a Defense at Trial

        1.    Petitioner's Allegations and Pertinent State Court Record

            a.    Overview of Claim

Petitioner asserts that after obtaining a mental health expert to assist him with this case, counsel provided ineffective assistance by failing to have the expert evaluate petitioner's mental state at the time of the offense. "The circumstances of this case command[ed] that any reasonably competent lawyer conduct a psychological evaluation in order to determine whether there was something happening in the [petitioner's] mind that would have supported a self-defense theory." ECF No. 1-1 at 9. Absent such an evaluation, counsel could not competently choose a trial strategy in this case. Mental health assessments that were conducted after petitioner was transferred to state prison demonstrate that he suffered from Post Traumatic Stress Disorder as a result of his law enforcement experience. Dr. Berg, petitioner's postconviction expert, concluded that petitioner was suffering from PTSD at the time of the shooting and that this affected his perception of the victim's actions.

According to petitioner, counsel's deficient performance was prejudicial for three basic reasons. "First, the effects of PTSD [we]re relevant to determine whether [petitioner] subjectively believed he was in danger at the time he shot Dumont. This determination is the difference between first degree murder and voluntary manslaughter…. Second, California case law on self-defense establishes that mental health conditions like PTSD may be considered both in terms of the subjective element and the objective reasonableness of the defendant's belief in the need to defend himself or herself…. Third, the presentation of the PTSD evidence would have enhanced Greenberg's credibility." ECF No. 1-1 at 15. Because petitioner testified in his own defense, the jury's verdict turned on an assessment of his credibility. Had the jury been provided with expert mental health evidence concerning petitioner's PTSD, "there is more than a reasonable probability that it would have found Greenberg guilty of voluntary manslaughter, at most, or potentially acquitted him of the offense altogether." ECF No. 1-1 at 18.

1                  b.  <u>Pertinent Portions of the Trial Record</u>

2        In the immediate aftermath of the homicide, while petitioner was hospitalized for his self-

3 inflicted gunshot wound, the public defender obtained the appointment of a mental health expert,

4 Eugene P. Roeder, Ph.D.  ECF No. 12-15 at 40-42.  Dr. Roeder was appointed pursuant to

5 California Evidence Code § 1017(a), <u>id.</u> at 42, which provides for a confidential report to defense

6 counsel intended to "provide the lawyer with information needed so that he or she may advise the

7 defendant whether… to present a defense based on his or her mental or emotional condition."

8 However, neither the public defender nor trial counsel, who took over the case approximately a

9 year and a half later, had Dr. Roeder interview and evaluate petitioner.

10        At trial, counsel offered Dr. Roeder's expert testimony on the topic of suicidality

11 generally.  5 RT  1301-1311 (transcript of hearing pursuant to Cal. Evid. Code § 402).  The

12 defense wanted to elicit expert testimony to counter the prosecutorial theory that petitioner's

13 suicide attempt reflected consciousness of guilt.  Counsel proffered Dr. Roeder's testimony

14 regarding suicide attempts among police officers in response to traumatic events including

15 accidental shootings.  <u>Id.</u> at 1302-1309.  In response to the court's question at the 402 hearing, Dr.

16 Roeder confirmed that he had not evaluated petitioner.  <u>Id.</u> at 1309.  The court excluded the

17 testimony.  <u>Id.</u> at 1310-1311.

18        The defense did not present any expert evidence regarding petitioner's mental state at the

19 time of the shooting.  Relying on petitioner's testimony alone, counsel argued that petitioner shot

20 Dumont because he believed that Dumont was pulling out a gun from his truck and was about to

21 shoot him.  <u>See</u> 7 RT 1810, 1813, 1815, 1820 (ECF No. 12-24 at 120, 123, 125, 130).[3]  Counsel

22 also argued that petitioner had shot himself because he was devastated that he had shot Dumont.

23 7 RT 1821 (ECRF No. 12-24 at 131).  In accordance with the jury instructions on perfect and

24 imperfect self-defense, counsel concluded by arguing that if the victim had actually pulled a gun

25 _____

26 [3]  "This again is a panic shooting situation.  This is not an execution.  This is not a murder.  This
is somebody reacting to something that they saw, reacting to a gun being pulled on him and firing

27 because he is scared out if his mind and he is laying down cover fire…"  7 RT 1815 (ECF No. 12-
24 at 125).

28

as petitioner testified, or had simulated pulling a gun, then the shooting was in self-defense and petitioner must be found not guilty; if petitioner had honestly but unreasonably believed that the victim was pulling a gun, then petitioner could be guilty of only voluntary manslaughter.  7 RT 1823 (ECF No. 12-24 at 133).

### c.   Evidence Presented to the Superior Court in Habeas

#### i.   Trial Counsel's Testimony

Trial counsel testified at the superior court evidentiary hearing that he "did not see a mental defense in this case.  What I did see [a need for] was something to try to explain why Mr. Greenberg committed – attempted to commit suicide after the shooting.  And I looked into that." ECF No. 1-2 at 138.  Counsel considered petitioner's attempted suicide to be "the most damning part of the case," and he tried unsuccessfully to use Dr. Roeder's general testimony about law enforcement suicides to explain it.  Id. at 148, 191.  Counsel could not explain why he failed to have Dr. Roeder evaluate petitioner; he was aware that Dr. Roeder performed mental health evaluations.  Id. at 148-49.

Counsel knew what PTSD was prior to handling petitioner's case.  ECF No. 1-2 at 131. He also agreed that "[y]ou can't put on a mental defense without an expert…."  ECF No. 1-2 at 134.

Because petitioner testified that the victim had a gun, but no such gun was ever recovered, counsel argued imperfect self-defense to the jury.  Id. at 170-171.

#### ii.   Harry Stern, Esquire

Harry Stern, a lawyer and former police officer, testified as an attorney expert on the legal representation of police officers.  ECF No. 1-2 at 258-261, 269.  Mr. Stern indicated that he looks for PTSD "almost as a matter of course" when representing law enforcement officers, "particularly in use of force cases."  ECF No. 1-2 at 273.  According to Mr. Stern, "mental state… can be a critical component" in a use of force case involving a law enforcement officer "whether it's on or after duty."  ECF No. 1-2 at 275.  Mr. Stern opined that "a reasonably effective attorney" would explore the PTSD issue when working with a law enforcement officer as a client who "had a relatively lengthy, active career…."  Id. at 283.

10

1          iii.      Paul S.D. Berg, Ph.D.

2          Dr. Paul Berg was an expert in evaluating PTSD and had over 40 years of experience

3  working with law enforcement officers.  ECF No. 1-2 at 290-91, 296.  In an initial affidavit dated

4  June 26, 2016 (ECF No. 1-2 at 590-595), which was based on a review of available records[4] and

5  submitted with the habeas petition, Dr. Berg stated: "It appears to be indisputable that Morris

6  Greenberg suffers from a Post-Traumatic Stress Disorder" as a result of his law enforcement

7  career.  ECF No. 1-2 at 591.  He noted that petitioner had been diagnosed with PTSD by prison

8  psychologists since the homicide.  Id. at 592.  Dr. Berg "believe[d] to a reasonable degree of

9  medical certainty that Mr. Greenberg suffered from Post-Traumatic Stress Disorder at the time he

10  shot and killed Mr. Dumont."  Id.  The effects of petitioner's PTSD were "likely… activated

11  during [the] events" of July 20, 2008, and "would have affected his perception of a possible

12  danger he faced" from Dumont.  Id. at 593, 594.  The affidavit addressed potential uses of mental

13  health evidence to explain both the shooting of Dumont and petitioner's suicide attempt, and to

14  counter the prosecution's theories related to motive and consciousness of guilt.  Id. at 593-595.

15          Dr. Berg next authored a report dated August 30, 2016, which followed a comprehensive

16  psychological evaluation of petitioner conducted at Mule Creek State Prison.  ECF No. 1-2 at

17  633-649.  On the basis of a clinical interview, the previous records review, a mental status exam

18  and psychological testing, all of which were reported in detail, Dr. Berg confirmed his PTSD

19  diagnosis.  He opined that PTSD from petitioner's time as a police officer, in combination with

20  various psychological stressors on the date of the homicide, explained petitioner's subjective

21  belief that his own life was in danger and was consistent with him shooting Dumont

22  "reflexively."  Id. at 648-49.

23          In a declaration dated September 17, 2017, Dr. Berg addressed additional CDCR records

24  that had been submitted to the superior court with the District Attorney's response to the state

25  _____

26  [4]  Dr. Berg reviewed 76 pages of CDCR records, the petition for review in the California Supreme
    Court, the complete testimony of petitioner as well as his estranged wife, Barrie Greenberg, Dr.
27  Roeder's testimony from the 402 hearing, and the California Court of Appeal opinion.  ECF No.
    1-2 at 591.

28

habeas petition.  ECF No. 1-2 at 651-653.  Dr. Berg affirmed his previous opinions that

petitioner's PTSD had predated the homicide and continued into his incarceration, and "that the

disorder had a direct and compelling influence on his behavior" in shooting Dumont and himself.

Id. at 652.  He declared:

> As an experienced psychological examiner of over 50 years of
> experience, had I been given any background information on
> Morris Greenberg prior to his trial, particularly given his history
> working with law enforcement, I would have strongly urged his
> counsel to have him undergo a psychological examination with the
> purpose of presenting that information to the jury for its
> consideration.  I am further confident that any competent mental
> health provider who evaluated Morris Greenberg would have also
> come to the conclusion that he suffered from post-Traumatic Stress
> Disorder and that his behavior at the time of the crime was clearly
> shaped and inspired and influenced by his psychological illness. …
> I am confident that the jury would have been deprived of essential
> information without such testimony because it sheds light on
> Morris Greenberg's mental state at the time of the homicide, which
> was the only real issue at trial.

Id. at 653.

At the August 29, 2018 evidentiary hearing, Dr. Berg testified regarding all of these

Dr. Berg's 2017 declaration also responded to a statement made by trial counsel, who had

answered the question whether he ever considered ordering a psychological evaluation in

petitioner's case by stating that he "did not recall anything that gave rise to competency issues."

Id.  Dr. Berg noted that "[e]valuating an individual for competence to stand trial versus Post-

Traumatic Stress Disorder are very different assessments.  While a defendant's competence

generally manifests in objective symptoms that an attorney may be able to recognize, Post-

Traumatic Stress Disorder requires an evaluation by a mental health specialist and bears upon

other questions than whether or not a person is competent to stand trial."  Id.

At the August 29, 2018 evidentiary hearing, Dr. Berg testified regarding all of these

opinions.  ECF No 1-2 at 289-386.  He noted that, as indicated in his initial affidavit, the CDCR

psychological records alone gave the "strong appearance" that petitioner suffered from PTSD and

that it was a factor in the crime.  Id. at 299.  Dr. Berg examined petitioner in prison for a full day

before reaching his clinical opinion that petitioner "absolutely" suffered from PTSD as "the result

of his time working as a police officer for the Burlingame Police Department."  Id. at 309-311.

Based on the psychological testing conducted by Dr. Berg, petitioner "was not exaggerating

1  problems." Id. at 313.

2       Dr. Berg's review of the CDCR records revealed "six particular different specialists,

3  psychiatrists, psychologists, and in one case a licensed clinical social worker, all of whom

4  addressed the issue of post traumatic stress disorder.  And a couple of them even more

5  specifically, not just that they believed he had it, that he was diagnosed as such, but that it

6  originated from his work as a police officer." Id. at 300.  According to Dr. Berg, "untreated

7  PTSD can only become worse and worse.  It doesn't expire like a cold.  It doesn't [just] run its

8  course.  If it's untreated[,] it's a ticking time bomb." Id. at 305-06.  Regarding the occasions in

9  which the CDCR records did not include a PTSD diagnosis, Dr. Berg explained that this did not

10  change his opinion. Id. at 357.  He also pointed out that "one or two [of the records] that included

11  it with an RO, a rule-out modifier…" which "means either I need a few more facts or I think so."

12  Id. at 357.  The "overwhelming diagnosis" of petitioner reflected in the CDCR records was

13  "PTSD and depression, sometimes called in the reports dysthymia, sometimes called major

14  depressive disorder, but basically depression." Id. at 358.  Dr. Berg would likely have found both

15  PTSD and depression if he had seen petitioner "at the time of his work with the police

16  department… at the time right after the event occurred, [or] at the time when he was in trial…."

17  Id. at 315.  Dr. Berg did not rely on the CDCR records to diagnose petitioner, but the records "just

18  corroborated" what he "independently found through personal evaluation" of petitioner. Id. at

19  359.

20       As for the role of petitioner's PTSD in the shooting, Dr. Berg explained that petitioner's

21  "hypervigilance was lit up, was illuminated in and around the time of what happened because of

22  what he had heard about the victim." Id. at 341; see also id. at 343-344.  Petitioner's PTSD in the

23  context of the immediate stressors caused him to think he was in danger, impaired his ability to

24  see things clearly, and created a "highly over-intensified view" of what was happening. Id. at

25  345.  A mistaken belief that the victim had a gun was "absolutely" consistent with PTSD. Id.

26  Indeed, given petitioner's mental impairments, Dr. Berg found "the fact that [petitioner] would

27  believe that what [Dumont] was reaching for was a gun is not only possible, it's practically

28  predictable." Id. at 346.

When asked about petitioner's suicide attempt, Dr. Berg opined that petitioner "could not tolerate what he had done and tried to kill himself" as soon as he realized that Dumont did not in fact have a gun. Id. at 347. A psychological examination was necessary to understand the suicide attempt. Id. at 348. For a lawyer to assess "something that significant, that potentially life changing, without having someone examined, is crazy." Id.

iv.    <u>CDCR Records</u>

The superior court initially ruled that petitioner's mental health treatment records from the CDCR were admissible "as a basis for the doctor's opinion, if in fact it is a basis." ECF No. 1-2 at 337. Later the trial court clarified that it would "ignore the opinions of the author, but the reports themselves, the factual statements… by the [petitioner], I will allow those in basically as an item that was relied upon by Dr. Berg in making his ultimate opinion." ECF No. 1-2 at 393.

v.    <u>Respondent's Case</u>

The District Attorney did not present testimony from any of the CDCR mental health clinicians who had evaluated petitioner, nor any independent expert who reached a medical opinion contrary to that of Dr. Berg.

d.  <u>Additional Evidence Presented to California Supreme Court</u>

The habeas petition filed in the California Supreme Court relied on the above body of evidence as supplemented by a new declaration from Dr. Berg. ECF No. 1-2 at 765-772; ECF No. 12-13 at 773-780. Dr. Berg addressed the superior court's reliance on the lack of diagnostic unanimity among CDCR evaluators, all of whom found that petitioner suffered from a mental health disorder and a majority of whom (though not all) indicated a PTSD diagnosis. Id. at 776-777. Dr. Berg noted that the correctional records did not contain any evaluation as thorough as the one he had conducted, and that correctional assessments necessarily focus on immediate treatment needs rather than petitioner's mental state at the time of the offense. Id. at 768-769. He reiterated that his own conclusions were not based on, but merely corroborated by, the CDCR records. Id. at 769. He concluded:

> … I would reaffirm my opinions that Morris Greenberg suffered from a Post-Traumatic Stress Disorder that predated the commission of the crime, that it played a major factor in his actions,

14

1

in fact a compelling role, and that the failure to consider that and raise this as an issue at trial resulted in damaged representation.

2

3

[¶] Based on my extensive experience as a Clinical Psychologist in general, more specifically a Psychologist with years of experience as an expert in police psychology, and having worked within the Correctional system, I am confident that had any practitioner performed a comprehensive evaluation, had looked at the circumstances of the events at the time of the shooting, and considered his history as a Police Officer, would have come to the same conclusions that I did, i.e., that Morris Greenberg was suffering from Post-Traumatic Stress Disorder at the time of the killing and that this was a salient and compelling factor in his behavior and should have been considered at trial.

4

5

6

7

8

9

Id. at 771-772.

10

       2.   The Clearly Established Federal Law

11

      The two prong Strickland standard governing ineffective assistance of counsel claims

12

is well known and oft-cited. Strickland v. Washington, 466 U.S. 668 (1984). It requires

13

petitioner to establish (1) that counsel's representation fell below an objective standard of

14

reasonableness; and (2) that counsel's deficient performance prejudiced the defense. Strickland,

15

466 U.S. at 692, 694. "The question is whether an attorney's representation amounted to

16

deficient performance under 'prevailing professional norms,' not whether it deviated from best

17

practices or most common custom." Harrington, 562 U.S. at 105 (citing Strickland, 466 U.S. at

18

690). However, "courts may not indulge 'post hoc rationalization' for counsel's decisionmaking

19

that contradicts the available evidence of counsel's actions." Id. at 109 (quoting Wiggins v.

20

Smith, 539 U.S. 510, 526-27 (2003)). Prejudice is found where "there is a reasonable probability

21

that, but for counsel's unprofessional errors, the result of the proceeding would have been

22

different. A reasonable probability is a probability sufficient to undermine confidence in the

23

outcome." Strickland, 466 U.S. at 693. "That requires a 'substantial,' not just 'conceivable,'

24

likelihood of a different result." Pinholster, 563 U.S. at 189 (quoting Harrington, 562 U.S. 86,

25

111-12 (2011)).

26

      In reviewing a Strickland claim under the AEDPA, the federal court is "doubly

27

deferential" in determining whether counsel's challenged conduct was deficient. "When §

28

2254(d) applies, the question is not whether counsel's actions were reasonable. The question is

1    whether there is any reasonable argument that counsel satisfied Strickland's deferential standard."

2    Harrington, 562 U.S. 86, 105 (2011).

3                    3.   The State Court's Ruling

4                        a.   Determining Which State Court Ruling is Subject to AEDPA Review

5            The first question this court must answer is which state court decision is the subject of

6    review under § 2254(d).  "Where there has been one reasoned state judgment rejecting a federal

7    claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the

8    same ground."  Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); see also Gill v. Ayers, 342 F.3d

9    911, 917 n. 5 (9th Cir. 2003) (explaining that federal courts "look through" unexplained rulings of

10   higher state courts to the last reasoned decision).  Courts in the Ninth Circuit have long applied

11   the so-called "look through" presumption to California state habeas decisions.  See e.g., Gill, 342

12   F.3d at 917 n. 5; Bonner v. Carey, 425 F.3d 1145, 1148 n.13 (9th Cir. 2005).  However, in the

13   context of the look-through doctrine as it applies to California habeas decisions, the Supreme

14   Court has emphasized that "the California courts or Legislature can alter the State's practices or

15   elaborate more fully on their import."  See Harrington, 562 U.S. at 100.

16           In 2020, the California Supreme Court clarified that its summary denial of an original

17   habeas petition does *not* reflect implicit adoption of the prior reasoned decision of a lower court

18   that previously rejected the same claim.  Robinson v. Lewis, 9 Cal.5th 883 (2020).[5]  In Robinson,

19   the California Supreme Court emphasized the difference between post-conviction review, in

20   which "[a]ll courts in California have original habeas corpus jurisdiction[,]" and direct appellate

21   review.  Robinson, 9 Cal.5th at 895.  Notably, "a new petition for writ of habeas corpus differs

22   from an appeal in important respects.  The new petition can add to or attempt to bolster the claims

23   made in the earlier [habeas] petition."  Robinson, 9 Cal.5th at 895.  Moreover, "[i]f a lower [state]

24   court has made factual findings following an evidentiary hearing [on a habeas corpus petition],

25   the higher court will give those findings great weight, but it is not bound by them.  Thus, a Court

26   _____

27   [5]  In Robinson, the state court was answering a question certified to it by the Ninth Circuit
     regarding state habeas timeliness rules and so-called "gap delays" between petitions filed in the
     various state courts.

28

1     of Appeal that considers a new [habeas] petition does not directly review the superior court's

2     ruling but makes its own ruling."  Robinson, 9 Cal.5th at 896 (internal citation omitted).

3           The only published decision of the Ninth Circuit to have considered the impact of

4     Robinson on application of the "look through" presumption is Flemming v. Matteson, 26 F.4th

5     1136 (9th Cir. 2022), which held inter alia that the presumption did still apply under the

6     circumstances of the case.  Flemming's facts and procedural posture are readily distinguishable

7     from those of the instant case.  The issue before the Ninth Circuit was the timeliness of the federal

8     petition, which in the final analysis turned on whether the initial superior court petition had been

9     untimely and thus failed to toll the federal statute of limitations.  In this context, the Ninth Circuit

10    concluded that later silent denials by higher state courts had not overruled or rejected the superior

11    court's untimeliness finding.  It therefore "looked through" silent rejections of petitioner's claims

12    in the state appellate court to a reasoned decision of the superior court finding the claims

13    untimely, finding this result consistent with Robinson.  Id. at 1143.  Robinson does indeed

14    support that conclusion, because it establishes that each state court is making its own timeliness

15    decision as to the claims before it.

16          Flemming is inapposite here.  Although Robinson itself involved the independent

17    evaluation of timeliness by various state courts, its general explanation of state habeas procedure

18    and the significance of California's unique "original jurisdiction" model of state habeas was not

19    limited to timeliness but applies equally to merits determinations.  Indeed, the state court

20    reframed the timeliness question certified to it by the Ninth Circuit because the Ninth Circuit had

21    "assumed that a habeas corpus petition filed in a higher court constitutes a challenge to the lower

22    court's denial of a previous petition."  Robinson, 9 Cal.5th at 895.  This assumption is incorrect, as

23    the state court expressly stated.  It is the same assumption that underlies federal courts'

24    application of the "look through" presumption to successive merits determinations in state habeas.

25    Accordingly, Robinson undercuts the predicate for application of the "look through" presumption

26    in California habeas cases.[6]

27

28    [6]  Robinson has no effect on application of the "look through" presumption to the denial of review
(continued…)

1    For these reasons, the undersigned concludes that the decision of the California Supreme

2    Court is the ruling subject to AEDPA review.  Following <u>Robinson</u>, this court will not presume

3    that the California Supreme Court denied petitioner's claim for the reasons articulated by the

4    superior court but will turn directly to the decision of the state's highest court.[7]

5           b.   <u>The California Supreme Court's Decision</u>

6    The California Supreme Court denied the claim without comment or citation.  ECF No. 1-

7    2 at 5.  A summary denial by a California court constitutes a determination that the petitioner has

8    not stated a prima facie claim for relief.  <u>Pinholster</u>, 563 U.S. at 188 n.12 (citing <u>In re Clark</u>, 5

9    Cal.4th 750, 770 (1993)).[8]

10          4.   <u>Objective Reasonableness Under § 2254(d)</u>

11          a.   <u>Introduction</u>

12   When the state court rejects a claim without explaining its reasoning, the federal court

13   must conduct an independent review of the record to determine what rational could support the

14   state court judgment and whether such rational was an objectively reasonable application of

15   federal law.  <u>See</u> <u>Harrington</u>, 562 U.S. at 102; <u>Pinholster</u>, 563 U.S. at 188; <u>Delgado v. Lewis</u>, 223

16   F.3d 976, 982 (9th Cir. 2000).  This court must accordingly decide whether the California

17   Supreme Court's determination that petitioner failed to establish a prima facie case of ineffective

18   assistance of counsel was contrary to or an unreasonable application of <u>Strickland</u>, <u>supra</u>.  <u>See</u>

19   <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054-1055 (9th Cir. 2003) (when a state court denies a claim

20   for failing to state a prima facie case, the absence of a prima facie case is the determination that

21   must be reviewed for reasonableness under § 2254(d)), <u>cert. denied</u>, 543 U.S. 1038 (2004).

22   For the reasons that follow, the undersigned concludes that petitioner presented the state

23   

24   on direct appeal.  In that context, unlike California habeas, the high court is specifically asked to
     review the decision of the intermediate court of appeal.

25   [7]  Should the assigned district judge disagree, the undersigned provides an alternative discussion
     of the superior court's decision below.

26   [8]  Under California law, a summary merits denial means that the California Supreme Court
     assumed the truth of all factual allegations asserted in support of the claim, and nonetheless

27   concluded that those facts did not state a claim entitling the petitioner to relief.  <u>People v. Duvall</u>,
     9 Cal. 4th 464, 474 (1995); <u>People v. Romero</u>, 8 Cal. 4th 728, 737 (1994).

28

court with an ample factual basis to establish both elements of his <u>Strickland</u> claim: deficient performance by trial counsel, and prejudice from counsel's failure to obtain a mental health evaluation and present PTSD evidence at trial in support of imperfect self-defense.  Accordingly, it was objectively unreasonable for the California Supreme Court to summarily deny the petition for failure to establish a prima facie case.

b.  <u>Deficient Performance</u>

The performance prong of an ineffective assistance claim is measured by objective reasonableness under prevailing professional norms.  <u>Strickland</u>, 466 U.S. at 688.  Counsel's strategic choices are generally accorded deference, but only if those decisions are themselves reasonable and are based on reasonable investigations, research, and judgments.  <u>Id.</u> at 690-91.  In other words, a lawyer's presumably strategic decision not to pursue a certain line of defense or present certain evidence is entitled to deference as reasonable only to the extent that it was supported by reasonable investigation.  <u>See</u> <u>Jones v. Wood</u>, 114 F.3d 1002, 1010 (9th Cir. 1997); <u>Jennings v. Woodford</u>, 290 F.3d 1006, 1010 (9 Cir. 2002) ("attorneys have considerable latitude to make strategic decisions about what investigations to conduct *once they have gathered sufficient evidence upon which to base their tactical choices*") (emphasis in original), <u>cert. denied</u>, 539 958 (2003).  The Supreme Court has explained that counsel must conduct a "thorough investigation" before a decision can be considered strategic under <u>Strickland</u>.  <u>Williams v. Taylor</u>, 529 U.S. 362, 396 (2000).

This case turned entirely on the jury's determination of petitioner's state of mind, and it is undisputed that trial counsel conducted no preliminary investigation into petitioner's mental state at the time of the shooting.  Confronted with a client who insisted his victim had a gun when the evidence showed that there was no such gun, counsel decided to nonetheless pursue a self-defense theory which required the jury to find that petitioner *reasonably* believed himself to be in imminent danger.[9]  He chose to argue imperfect self-defense in the alternative, as a fallback

---

[9]  Under California law, a killing is excused as being in self-defense where the defendant actually and reasonably believed in the need to defend against imminent danger to life or great bodily injury.  <u>People v. Humphrey</u>, 13 Cal. 4th 1073, 1082 (1996).

position, without any evidence or any explanatory theory to persuade the jury that petitioner believed *genuinely* if unreasonably that Dumont was armed.[10]  This decision was made without any prior exploration of the availability or strength of relevant mental health evidence.  Accordingly, counsel was in no position to evaluate the relative merits of a defense turning on objective circumstance (self-defense) and one relying on petitioner's subjective mental state (imperfect self-defense), or to decide whether or not an imperfect self-defense "fallback" theory should rely on mental health evidence.  The choice of defense in this case thus cannot even be considered a strategic one within the meaning of Strickland.  See Williams, 529 U.S. at 396; Correll v. Ryan, 539 F.3d 938, 949 (9th Cir. 2008) ("an uninformed strategy is not a reasoned strategy."); Bragg v. Galaza, 242 F.3d 1082, 1088-89 (Strickland requires trial counsel to investigate the "most important defense"), as amended by 253 F.3d 1150 (9th Cir. 2001); Rios v. Rocha, 299 F.3d 796, 807, n. 18 (9th Cir. 2002) (emphasizing that "there is no possible justification for failing to at least conduct a preliminary investigation of both defenses before choosing one or both.").

Independent review of the record reveals that trial counsel had no strategic or tactical justification for failing to ask Dr. Roeder—whose services had been authorized by the court and who was well known to counsel—or another expert to evaluate petitioner's mental health before selecting a trial strategy.  Counsel simply failed to identify this case as one potentially involving mental health evidence, despite numerous indicators.  Although counsel was aware of PTSD and knew about petitioner's law enforcement background, and despite the big flashing red light of petitioner's attempted suicide, he "did not see a mental defense in this case."  ECF No. 1-2 at 138.  And despite recognizing that the suicide attempt needed to be addressed by the defense at trial, id., counsel failed to seek a professional opinion regarding petitioner's state of mind.[11]

---

[10]  A defendant who kills with an actual but unreasonable belief in the need to defend against imminent danger to life or great bodily injury acts without malice, and can be convicted of a crime no greater than voluntary manslaughter.  Humphrey, 13 Cal. 4th at 1086; In re Christian S., 7 Cal. 4th 768, 771 (1994); People v. Cortes, 192 Cal. App. 4th 873, 908-912 (2011).

[11]  It is also clear from the record that counsel failed to consult any member of his professional community who had experience defending present and former police officers charged with crimes (continued…)

On the facts of this case, it was objectively unreasonable for trial counsel not to explore the question whether a defense based on petitioner's mental state, or incorporating expert mental health opinion evidence, was available.  California law clearly provides for the admission of PTSD and related mental health evidence in support of perfect or imperfect self-defense and/or to raise a reasonable doubt as to intent to kill.  See People v. Cortes, 192 Cal. App. 4th 873, 909-912 (2011); see also People v. Herrera, 247 Cal. App. 4th 467, 475-478 (2016).  The failure to investigate this possibility is irreconcilable with constitutionally adequate representation.  See Jennings, 290 F.3d at 1016 (finding deficient performance where counsel failed to thoroughly investigate mental health issues in capital murder case in which "raising a reasonable doubt as to intent could be crucial"); Douglas v. Woodford, 316 F.3d 1079, 1085 (9th Cir.) ("trial counsel has a duty to investigate a defendant's mental state if there is evidence to suggest that the defendant is impaired."), cert. denied, 540 U.S. 810 (2003); Weeden v. Johnson, 854 F.3d 1063, 1070-1071 (9th Cir. 2017) ("Given the exculpatory potential of psychological evidence, counsel's failure to investigate 'ignored pertinent avenues for investigation of which he should have been aware.'") (citations omitted).  Counsel's failure to conduct even a preliminary mental state investigation was so clearly unreasonable that the California Supreme Court cannot reasonably have found that petitioner failed to state a prima facie case of deficient performance.

   c.  Prejudice

The test for prejudice is whether there is a reasonable probability of a different outcome but for counsel's deficient performance, which is defined as a probability sufficient to undermine the court's confidence in the verdict.  Strickland, 466 U.S. at 693.  Here, the question is whether there is a reasonable probability that had counsel obtained a pretrial evaluation of petitioner's mental state at the time of the homicide, he would have developed evidence of petitioner's PTSD which would have swayed the jury to reach a lesser verdict.

The only psychological evaluation addressing petitioner's mental state at the time of the

---

of violence, as the declarations and testimony of both Mr. Stern and Dr. Berg establish that PTSD evaluations are standard in such cases.

homicide is that of Dr. Berg, whose opinions and conclusions are set forth in some detail above.
There are no competing expert opinions in the record.  Dr. Berg has declared that "any competent mental health provider" conducting a thorough examination prior to petitioner's trial would have reached the conclusion that petitioner suffered from PTSD which caused him to perceive a threat to his life immediately before he shot Dumont.  ECF No. 1-2 at 653.  There is no contrary mental health evidence regarding petitioner's state prior to or at the time of the crime.  Accordingly, the question is whether the expert opinion evidence presented by Dr. Berg would likely have led to a more favorable verdict.

As California courts have recognized in cases addressing the admissibility and uses of expert mental health testimony, PTSD and related mental health conditions can have great probative force regarding both perfect and imperfect self-defense as well as the specific intent required for a first degree murder conviction.  Cortes, 192 Cal. App. 4th at 909-912; Herrera, 247 Cal. App. 4th at 475-478.  Dr. Berg's testimony directly addressed the most important issues that petitioner's jury had to decide: whether petitioner killed Dumont with malice; whether petitioner saw (or believed he saw) Dumont retrieving a gun from his truck; how petitioner could have thought there was a gun when in fact there was no gun; and whether petitioner shot himself to escape the consequences of a deliberate murder or in a panic of remorse about his own mistake.  Dr. Berg addressed each of these issues, and his opinion supported a PTSD-based explanation for petitioner's actions that was both consistent with plaintiff's testimony and provided a basis for the jury to find petitioner guilty of no more than manslaughter.

On review of the record as a whole, the undersigned can identify no rationale that would reasonably support the California Supreme Court's finding that petitioner failed to present a prima facie case of prejudice from trial counsel's error.  Since expert mental health evidence in this case both provided an alternative explanation for the most inculpatory evidence and buttressed petitioner's credibility, it would likely have raised a reasonable doubt for the jury about whether petitioner acted with the premeditation and deliberation necessary to support a first degree murder conviction.  Even if the jury determined that petitioner's actual belief in the need to defend himself was unreasonable, the jury could have utilized the mental health evidence to

22

1  convict petitioner of voluntary manslaughter instead of first degree murder.[12]  Because Dr. Berg's

2  opinion is facially adequate to support a more favorable outcome, and if accepted undermines

3  confidence in the verdict, it was objectively unreasonable for the state court to find no prima facie

4  Strickland claim.  See Nunes, 350 F.3d at 1053 (state court unreasonably rejected ineffective

5  assistance claim for lack of a prima facie case where plaintiff's allegations and evidence, taken at

6  face value, were clearly sufficient to state a claim under Strickland).  Accordingly, § 2254(d)

7  interposes no barrier to habeas relief.

8             d.   Alternative § 2254(d) Analysis of Superior Court Decision

9         Even if the California Supreme Court implicitly adopted the superior court's reasons for

10  denying this claim (notwithstanding Robinson, supra, and despite the expansion of the factual

11  predicate for the claim on presentation to the California Supreme Court), the undersigned would

12  find denial of the claim to be objectively unreasonable.  As the court now explains, the trial

13  court's decision was contrary to and involved an unreasonable application of the Strickland

14  standard, as well as resting on an unreasonable determination of the facts based on the evidence

15  presented.  See 28 U.S.C. § 2254(d).[13]

16         In an opinion dated April 3, 2019, the superior court issued its order denying relief.  ECF

17  No. 12-12.  After accurately reciting the Strickland standard, id. at 4, the court presented a

18  lengthy discussion of prejudice and concluded that this prong was not satisfied.  Id. at 5-14.  This

19  

---

20  [12]  If convicted of voluntary manslaughter, the sentencing triad including the firearms

21  enhancement was 6, 10, or 21 years.  See ECF No. 1-2 at 460 (evidentiary hearing transcript). Petitioner's maximum sentencing exposure of 21 years for involuntary manslaughter is still below

22  the minimum sentence he received for first degree murder.  This additional sentencing exposure establishes prejudice.  See Glover v. United States, 531 U.S. 198 (2001) (holding that any

23  increase in a habeas petitioner's prison sentence is sufficient to establish prejudice under Strickland).  According to petitioner, he has already been in custody for the equivalent of a

24  voluntary manslaughter sentence.  See ECF No. 22.

[13]  The unreasonableness of the superior court's decision weighs against a finding that the

25  California Supreme Court implicitly adopted it.  See Wilson v. Sellers, 138 S. Ct. 1188, 1196

26  (2018) ("the unreasonableness of the lower court's decision itself provides some evidence that makes it less likely the state supreme court adopted the same reasoning.").  The undersigned

27  nonetheless provides this analysis in the event that the district judge disagrees with the recommendation not to apply the Ylst look-through presumption in light of Robinson, supra.

28

ultimate conclusion was based on the following findings of fact and law:

(1) Dr. Berg's diagnostic opinion was undercut by the court's independent evaluation of the CDCR mental health records, which did not unanimously reflect a PTSD diagnosis (id. at 5-10);

(2) "[I]t would have been extremely unlikely that back in 2011, Dr. Berg would have been retained as the petitioner's mental health expert" (id. at 11);

(3) Petitioner failed to prove that Dr. Roeder, or any other expert who might actually have evaluated petitioner in 2011, would have rendered a PTSD diagnosis (id. at 11-12);

(4) The court could not predict what a prosecution expert witness might have testified in response to a defense expert, or how a jury might have resolved any conflicting opinions (id. at 12); and

(5) Even assuming that the jury would have heard an unrebutted opinion substantially like Dr. Berg's, "the court does not automatically conclude that said testimony would have negated the possibility of a first-degree murder conviction.  The case presented by the people at trial presented the jury with ample evidence to find the petitioner guilty of first-degree murder, even if he was suffering from PTSD at the time of the shooting.  A person who suffers from PTSD is still capable of committing first-degree murder."  Id. at 12-13.

The undersigned will address these points in reverse order.  The latter-quoted passage materially misstates the Strickland prejudice standard and is therefore "contrary to" clearly established federal law.  See Williams, 529 U.S. at 405 ("contrary to" means "substantially different from the relevant precedent"); Benn v. Lambert, 283 F.3d 1040, 1051 n.5 (9th Cir.) (if a state court adds, deletes or alters an element of an established test, its decision may be "contrary to" established law), cert. denied, 537 U.S. 942 (2002).  A habeas petitioner is not required to present evidence which would have "negated the possibility of" the conviction he challenges.  Although counsel's deficient performance must have had more than a "conceivable effect" on the outcome, it need not have "more likely than not altered" the outcome.  Strickland, 466 U.S. at 693.  The superior court's "impossibility" standard is even stricter, and further from the rule

1  announced in Strickland, than the preponderance of the evidence standard for prejudice that the

2  Supreme Court itself has recognized as "contrary to" Strickland.  See Williams, 529 U.S. at 405-

3  406 (if a state court denied an ineffective assistance of counsel claim for failure to show prejudice

4  by a preponderance of the evidence standard rather than by a reasonable probability of a different

5  result standard, the state court's ruling would be "contrary to" Strickland because the state court

6  would be applying a stricter standard).

7       The superior court's prejudice methodology was also contrary to Strickland in relying on

8  the sufficiency of the prosecution's evidence to sustain the verdict.  The Strickland prejudice

9  inquiry may not be converted into a sufficiency-of-the-evidence question.  See Crace v. Herzog,

10 798 F.3d 840, 849 (9th Cir. 2015) (finding state court unreasonably applied Strickland by

11 pronouncing that there can be no prejudice where there is evidence sufficient to support the jury's

12 verdict).[14]  "Requiring a habeas petitioner to demonstrate that had counsel performed adequately

13 there would not have been sufficient evidence for a jury to convict is more akin to a … motion for

14 a judgment of acquittal and has no place in the Strickland test."  Hardy v. Chappell, 832 F.3d

15 1128, 1136 (9th Cir. 2016), as amended, 2017 U.S. App. LEXIS 1554 (9th Cir. 2017).  And while

16 it is of course true that exculpatory mental health evidence need not be accepted by a jury, that

17 people with mental illness are not categorically incapable of forming a specific intent to kill, and

18 that habeas judges do not have crystal balls, Strickland requires none of that to establish

19 prejudice.

20      For all these reasons, the superior court's prejudice methodology was both contrary to and

21 an unreasonable application of Strickland.  See Crace, supra; Sessoms v. Runnels, 691 F.3d 1054,

22 1058 (9th Cir. 2012) ("The state court decision is both contrary to and involves an unreasonable

23

---

24 [14] "The familiar sufficiency-of-the-evidence analysis centering on whether a reasonable jury
   could have convicted an adequately represented defendant is considerably more deferential than
25 the Strickland test for prejudice in an ineffective-assistance case, which seeks only to discover
   whether the absence of error would have given rise to a reasonable probability of acquittal, such
26 that confidence in the verdict is undermined." Tice v. Johnson, 647 F.3d 87, 110 (4th Cir. 2011).
   See also Saranchak v. Sec'y Pa. Dep't of Corr., 802 F.3d 579, 599 (3d Cir. 2015) ("Strickland
27 prejudice does not depend on the sufficiency of the evidence despite counsel's mistakes").

28

application of Supreme Court precedent because it ... analyzed [petitioner]'s case using the incorrect legal framework."), judgment vacated on other grounds, 570 U.S. 928 (2013); Frantz v. Hazey, 533 F.3d 724, 734 (9th Cir. 2008) (en banc) (explaining that state court "mistakes in reasoning or in predicate decisions of the type in question here – use of the wrong legal rule or framework - do constitute error under the 'contrary to' prong of § 2254(d)(1)"); see also Lafler v. Cooper, 566 U.S. 156, 173-174 (2012) (finding that the state court's determination was contrary to clearly established federal law because it failed to apply the proper Strickland analysis to counsel's advice to reject the plea).

The superior court's other reasons for denying the claim also reflect an unreasonable application of Strickland. The court's own inability to "predict" what rebuttal evidence the prosecution would have developed in response to a defense trial expert is immaterial, and in any event does not weigh against relief. It is petitioner's responsibility on an ineffective assistance claim to show the evidence that a reasonable pretrial investigation would have uncovered. See Hendricks v. Calderon, 70 F.3d 1032, 1042 (1995) (to establish prejudice, petitioner must demonstrate what beneficial evidence a reasonable pretrial investigation would have turned up). Petitioner met this burden of production by presenting the opinions of Dr. Berg. The habeas evidentiary hearing was the opportunity for the prosecution to rebut Dr. Berg's opinion with competing expert opinion testimony if it wished to do so, and it did not avail itself of that opportunity. For the superior court to effectively hold the state's failure to produce rebuttal evidence against petitioner is nothing less than perverse.

Similarly, the superior court manufactured a burden that Strickland does not impose by faulting petitioner for not proving which particular defense expert would have been retained in 2011 and what opinion that individual would have rendered. The court reframed the prejudice inquiry like this:

> The court can safely conclude that it would have been extremely
> unlikely that back in 2011, Dr. Berg would have been retained as
> the petitioner's mental health expert. [Footnote omitted.] While
> Petitioner alleges that he would have been convicted at most of
> voluntary manslaughter at the most if Dr. Berg had testified on his
> behalf, this assertion misses the issue that is before us. Rather, the
> first issue which must be addressed for Petitioner to meet his

1

2

3

> burden of establishing prejudice is whether Dr. Roeder, or some
> other mental health expert, examining the petitioner back in 2011,
> would have made the same PTSD diagnosis that Dr. Berg made in
> 2016.

4    ECF No. 12-12 at 11.

5           This approach is objectively unreasonable under Strickland.  The prejudice inquiry does

6    not ask the habeas court to retrospectively recreate the trial as it might have been, but rather to

7    evaluate the impact on the verdict of petitioner's newly developed evidence—here, Dr. Berg's

8    expert opinion, which included the opinion that "any competent mental health provider" in 2011

9    would have diagnosed petitioner with PTSD that affected his perception of danger at the time of

10   the homicide—in the context of all the evidence that actually exists from the trial and the post-

11   conviction proceedings combined.  See Strickland, 466 U.S. at 695; Wiggins, 539 U.S. at 536;

12   Williams, 529 U.S. at 397.

13          The superior court's primary reason for discounting Dr. Berg's opinion was that the

14   CDCR records do not establish diagnostic unanimity.  The court literally counted the number of

15   CDCR mental health clinicians who had and had not definitively diagnosed petitioner with PTSD

16   and, because the diagnosis was not "universally supported," concluded that petitioner had not

17   demonstrated that a PTSD diagnosis was available in 2011.  ECF No. 12-12 at 9-12.  This

18   reasoning is objectively unreasonable.  First, it is ironic that the court faulted petitioner for not

19   proving what would have happened in 2011 while rejected his prejudice showing on the basis of

20   mental health records that post-date his conviction.  It is further troubling that the court appears to

21   have substituted its own interpretation of mental health records for that of the only mental health

22   expert to have provided testimony—subject to adversarial testing and judicial inquiry—in any

23   form in this case.  And it is noteworthy that the court here ultimately relied on the CDCR records

24   for their diagnostic contents, after having ruled at the evidentiary hearing that they were

25   admissible only as materials reviewed by Dr. Berg and not for the opinions of their authors.

26   These factors indicate objectively unreasonable fact finding.  See 28 U.S.C. § 2254(d)(2); Taylor

27   v. Maddox, 366 F.3d 992, 999-1001 (9th Cir.) (an unreasonable determination of facts exists

28   where the state court made its findings according to a flawed process – for example, under an

incorrect legal standard, or where necessary findings were not made at all, or where the state court failed to consider and weigh relevant evidence that was properly presented to it), <u>cert. denied</u>, 543 U.S. 1038 (2004).

The CDCR records do not reasonably support the superior court's finding that Dr. Berg's opinion was unlikely to have been shared by any expert in 2011, or its conclusion that Dr. Berg's opinion fails to undermine confidence in the verdict.  It does not take an expert to see that correctional mental health treatment records serve a fundamentally different function than a comprehensive forensic evaluation of mental state at the time of a crime.  These types of evaluations follow different protocols, are conducted with different degrees of thoroughness under different circumstances, are designed to serve different ends,[15] and therefore cannot be weighed against each other arithmetically as the superior court did.  Dr. Berg explained why, in his expert opinion, the multiplicity of correctional PTSD diagnoses corroborated his own diagnostic assessment while the lack of unanimity did not undermine it.  No qualified mental health expert testified that the variation within the CDCR records was atypical of PTSD patients (or mental health patients more generally) or undermined the validity of Dr. Berg's conclusions.  The superior court's own conclusion that the records undermine the validity of the expert opinion was thus unsupported and therefore objectively unreasonable.

For all the reasons explained above, the opinion of the superior court interposes no bar to habeas relief under AEDPA even if the California Supreme Court adopted its reasoning *sub silentio*.

     5.  <u>De Novo Review</u>

        a.  <u>The Decision to Grant Relief</u>

The conclusion that relief is barred by § 2254(d) does not end the inquiry.  <u>See Fry v. Pliler</u>, 551 U.S. 112, 119 (2007) (§ 2254(d) establishes a precondition to federal habeas relief, but does not establish grounds for entitlement to relief).  The federal habeas court must conduct a de

---

[15]  This is plain from the documents themselves.  The CDCR records are devoid of any evaluation comparable in scope and methodology to Dr. Berg's.

1  novo review of the claim to determine if petitioner is entitled to relief.  Panetti v. Quarterman,

2  551 U.S. 930, 1062-1063 (2007); Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) (to

3  prevail, a federal habeas petitioner must establish the applicability of one of the § 2254(d)

4  exceptions and must also affirmatively establish the constitutional invalidity of his custody under

5  pre-AEDPA standards).  In some cases, "a holding on habeas review that a state court error meets

6  the § 2254(d) standard will … simultaneously constitute a holding that the § 2254(a)/§ 2241

7  requirement is satisfied as well, so no second inquiry will be necessary."  Frantz, 533 F.3d at 736.

8  This is such a case.

9                      b.  Deficient Performance

10      The undersigned has already determined in the § 2254(d) context that trial counsel failed

11  to conduct an investigation into petitioner's mental health, and that this omission was deficient

12  under Strickland because that information was necessary under the circumstances of the case to

13  make an informed choice about which avenue of defense to pursue at trial and how to pursue it.

14  The above discussions of trial counsel's deficient performance are adopted and incorporated by

15  reference here.  Under a de novo standard of review, the undersigned finds the performance prong

16  of petitioner's claim satisfied.

17                      c.  Prejudice

18      In determining prejudice under a de novo standard of review, this court relies upon its

19  prior analysis and conclusion that there was no reasonable rational that could support the

20  California Supreme Court's decision.  Had the jury in this case been presented with the expert

21  mental health evidence presented in habeas, there is a reasonable likelihood of a different result.

22  See Seidel v. Merkle, 146 F.3d 750, 757 (9th Cir. 1998), cert. denied, 525 U.S. 1093 (1999).  As

23  in Seidel, evidence of petitioner's PTSD was not presented to the jury to support imperfect self-

24  defense even though that evidence would have negated malice.  As in Seidel, "evidence

25  demonstrating [petitioner's] mental condition would have played a significant role in establishing

26  the requisite fear for purposes of self-defense."  Id.  As in Seidel, petitioner was prejudiced by

27  counsel's failure to develop and present evidence of his mental state.

28      Because the jury was required to reach a unanimous verdict, "the outcome could have

29

differed if only 'one juror would have struck a different balance.'" <u>Weeden</u>, 854 F.3d at (quoting <u>Wiggins</u>, 539 U.S. at 537).  The undersigned finds it reasonably probable that at least one juror would have concluded based on expert PTSD testimony that petitioner genuinely though unreasonably believed Dumont was about to kill him, and that the shooting was accordingly a manslaughter, or would have otherwise refused to join a first degree murder verdict.  It is noteworthy in this context that petitioner's jury deliberated for three days before reaching its verdict.  <u>See</u> ECF No. 12-17 at 55-64.  It was not an easy decision for the jury even without the expert mental health evidence.  <u>See</u> <u>Kipp v. Davis</u>, 971 F.3d 939, 959 (9th Cir. 2020) (finding it "compelling that the jury spent a few days in deliberations" in assessing the prejudice resulting from constitutional error).

For these reasons, the undersigned finds under a de novo standard of review that petitioner was prejudiced within the meaning of <u>Strickland</u>.  Accordingly, it will be recommended that relief be granted on Claim One.

     B.  <u>Claim Two: Ineffective Assistance for Failing to Investigate and Consult with a Forensics Expert to Supplement or Supplant the Actual Crime Scene Reconstructionist Who Testified at Trial for the Defense</u>

          1.  <u>Petitioner's Allegations and Pertinent State Court Record</u>[16]

At trial, the defense attempted to show that petitioner shot Dumont as petitioner was backing away, and the prosecution contended that petitioner was advancing as he fired.  The defense presented the testimony of a crime scene reconstructionist who prepared and presented diagrams and animations showing the trajectories of the bullets based on certain assumptions regarding the placement of the shooter, the victim, and the truck.  Petitioner alleges that those assumptions were speculative, and that the expert was predictably and effectively attacked by the prosecution.  He contends that trial counsel rendered ineffective assistance by failing to use a different, better expert in addition to or instead of the expert who testified.  Claim Two relies on a letter opinion obtained from Kenton S. Wong, Sr. Forensic Scientist, dated January 26, 2016,

---

[16] <u>See</u> ECF No. 1-1 at 20-23.

30

which identifies several deficiencies in the trial expert's presentation.  ECF No. 1-2 at 608-612.

Wong evaluated the crime scene and opined that it was "impossible to state with any scientific

degree of certainty the exact order of the gunshot wounds sustained by Mr. Dumont other than the

fact the fatal gunshot wound was the last."  Id. at 608-609.  Petitioner alleges that counsel was

deficient in focusing on the issue.

>            2.   The Clearly Established Federal Law

The same two-part Strickland standard previously articulated applies to this claim for

relief.  Strickland v. Washington, 466 U.S. 664 (1984).

>            3.   The State Court's Ruling

The California Supreme Court denied this claim in habeas without comment or citation.

>            4.   Objective Reasonableness Under § 2254(d)

Because the state court denied the claim summarily, the absence of a prima facie case is

the determination which must be reviewed for objective reasonableness under AEDPA.  See

Pinholster, 563 U.S. at 188 n.12; Nunes, 350 F.3d at 1054-55.

The California Supreme Court could well have denied relief based on a lack of prejudice

from trial counsel's selection of a crime scene reconstruction expert.  Even though the bona fides

of Mr. Wong are clearly superior to those of the expert chosen by trial counsel, the undersigned

cannot conclude that there is a reasonable likelihood of a different outcome in this case if a

different expert had been utilized.  First, even petitioner points out how much the actual crime

scene was disturbed, which rendered its significance "speculative and open to interpretation."

ECF No. 1-2 at 88.  "[It was virtually impossible to glean any real information from the crime

scene due to the mutability of all the significant pieces."  Id.  While petitioner focuses on this as a

way of demonstrating trial counsel's deficient performance in fixating on the crime scene

evidence, what it ultimately demonstrates to this court is that an alternative crime scene expert

would not have altered the jury's ultimate decision in this case.  Accordingly, this claim boils

down to the Monday morning quarterbacking described by the Supreme Court in Strickland that

does not, as a matter of law, constitute ineffective assistance of counsel in violation of the Sixth

Amendment.  Strickland, 466 U.S. at 689.

Because the state court could reasonably have denied this claim for lack of a prima facie prejudice showing, the undersigned recommends denying relief on petitioner's second ineffective assistance of counsel claim.

     5.  <u>Alternative 28 U.S.C. § 2254(d) Analysis</u>

Even assuming that the superior court's December 22, 2016 order is the last reasoned state court decision and thus subject to Section 2254(d) review, the undersigned still recommends denying relief. The superior court denied this claim based on lack of prejudice, finding that "trial counsel's performance, whether reasonable or not, did not prejudice the petitioner." ECF No. 12-8 at 5. "In discussing the forensic evidence, the petitioner clearly admitted that the issue in this case involved the petitioner's state of mind at the time of the shooting, and the forensic evidence was of little relevance." ECF No. 12-8 at 5. The undersigned cannot conclude that this decision was contrary to or an unreasonable application of <u>Strickland</u>. Accordingly, relief should be denied on this claim even if the <u>Ylst</u> look-through doctrine applies.

    C.  <u>Claim Three: Ineffective Assistance of Counsel for Failing to Investigate and Present Three Character Witnesses</u>

     1.  <u>Petitioner's Allegations and Pertinent State Court Record</u>

In this claim for relief, petitioner asserts that "[t]here were at least three witnesses whose names were known to trial counsel who, had they been interviewed and called as witnesses, would have provided positive character evidence in support of [petitioner] and also provided information related to Barrie Greenberg's character, the nature of the Greenbergs' marriage, and significant statements Barrie made." ECF No. 1 at 5. In support of the claim, petitioner provides summaries of an investigator's interviews with each of these three witnesses. ECF No. 1-2 at 628-631. The same evidence was presented in petitioner's state habeas petitions filed in the superior court and the California Supreme Court. The first prospective witness reported that Barrie was flirtatious, secretive, and had money problems, and that petitioner had never been aggressive toward her and would never plan to hurt anyone especially in front of his daughter. <u>Id.</u> at 628. The second witness stated that Barrie was "flashy" and "narcissistic" and treated petitioner badly. She implied that the couple's financial problems were Barrie's fault. She

1    reported things that Barrie said to her about the shooting after the fact, and expressed the opinion

2    that Barrie enjoyed having two men fighting over her.  Id. at 629-630.  The third witness

3    described Barrie as self-centered and materialistic, and reported that she often lied.  She said that

4    Barrie had told a mutual friend that she wondered why Dumont "didn't pull out his gun."

5    Petitioner never got angry or physical with Barrie.  Id. at 631.

6                    2.   The Clearly Established Federal Law

7            The same two-part Strickland standard previously articulated applies to this claim for

8    relief.  Strickland v. Washington, 466 U.S. 664 (1984).

9                    3.   The State Court's Ruling

10   The California Supreme Court denied this claim in habeas without comment or citation.

11                   4.   Objective Unreasonableness Under § 2254(d)

12          Because the state court denied the claim summarily, the absence of a prima facie case is

13   the determination which must be reviewed for objective reasonableness under AEDPA.  See

14   Pinholster, 563 U.S. at 188 n.12; Nunes, 350 F.3d at 1054-55.

15          The California Supreme Court could have reasonably have determined that this claim

16   failed for lack of prejudice.  To the extent the character evidence concerned petitioner, the

17   testimony of these witnesses would have been cumulative to that provided by other trial

18   witnesses.  Accordingly, their additional testimony would not have altered the jury's assessment

19   of petitioner's credibility or likely led to a different verdict.  As petitioner emphasizes in relation

20   to Claim One, the case against petitioner turned on his mental state at the time of the shooting.

21   None of the identified witnesses had anything to offer on that point.  This is not a case in which

22   the defense was going to rise or fall with the number character witnesses.  Although petitioner

23   argues that these witnesses were women and would have been more believable simply due to their

24   gender, ECF No. 17-1 at 18, the court does not find this argument persuasive.

25          Only one of these witnesses had any relevant testimony related to Barrie Greenberg's

26   character for truthfulness, see ECF No. 1-2 at 631, and petitioner does not explain how this would

27   have influenced the jury's credibility assessment in a manner that would have affected the verdict.

28   The remaining witnesses just described characteristics of Barrie's that were not relevant to any

issues at trial and therefore not admissible.

For all these reasons, the state court could reasonably have denied this claim for lack of a prima facie prejudice showing.  Accordingly, the undersigned recommends denying relief on petitioner's third ineffective assistance of counsel claim.

### 5.  Alternative 28 U.S.C. § 2254(d) Analysis

The undersigned makes the same recommendation even if the superior court's opinion is the decision subjected to § 2254(d) scrutiny.  The state trial court denied relief on grounds that trial counsel's performance did not fall below an objective standard of reasonableness nor was the failure to call additional character witnesses prejudicial.  "As trial counsel did call multiple character witnesses to testify at trial, it is difficult to criticize him for not calling potential witnesses he might not have known about."  ECF No. 12-8 at 7.  When determining prejudice, the state trial court emphasized that "major portions of these statements [of the new character witnesses] would have been ruled inadmissible as irrelevant."  ECF No. 12-8 at 7, n. 2.  As a result, the trial court found that petitioner had "not demonstrated that, if these witnesses had been called to testify, there is a reasonable probability that the result of the trial would have been different."  ECF No. 12-8 at 7.  Nothing about this decision is contrary to or an unreasonable application of the <u>Strickland</u> standard governing ineffective assistance of counsel claims.  Nor is it an unreasonable determination of the facts based on the evidence presented during state court proceedings.  Therefore the undersigned recommends denying relief on this claim even if the judgment of the superior court is the decision subject to review under AEDPA.

### D.   Claim Four: The Trial Court's Exclusion of Testimony of Two Defense Experts Violated Petitioner's Sixth Amendment Right to Present a Defense

#### 1.   Petitioner's Allegations and Pertinent State Court Record

At trial, the defense proffered and the court excluded two expert witnesses:  Dr. Eugene Roeder, the psychologist who would have testified about suicidal ideation among police officers, and Roy Bryson, a police officer and range master who had worked with petitioner and would have testified  about firearms training for police officers.  ECF No. 1-1 at 24-28.

////

34

1

2. The Clearly Established Federal Law

2          A criminal defendant has a constitutional right to present relevant evidence in his own

3 defense.  Chambers v. Mississippi, 410 U.S. 284 (1973); Crane v. Kentucky, 476 U.S. 683, 690

4 (1986). However, a defendant's right to present relevant evidence is not unlimited, but rather is

5 subject to reasonable restrictions such as evidentiary and procedural rules.  United States v.

6 Scheffer, 523 U.S. 303, 308 (1998).  The Supreme Court approves of "well-established rules of

7 evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by

8 certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the

9 jury."  Holmes v. South Carolina, 547 U.S. 319, 326 (2006).  The exclusion of evidence under

10 such well-established evidentiary rules is unconstitutional only where it "significantly

11 undermine[s] fundamental elements of the accused's defense."  Scheffer, 523 U.S. at 315.  A state

12 court's application of its own evidentiary rules only violates the constitutional right to present a

13 defense if it amounts to a per se bar on critical defense evidence or if the rules are applied in a

14 mechanistic fashion.  See Green v. Georgia, 442 U.S. 95 (1979) (per curiam); Chambers, 410

15 U.S. 284.

16

3. The State Court's Opinion

17          Petitioner exhausted this claim on direct appeal.  Because the California Supreme Court

18 denied discretionary review, the opinion of the California Court of Appeal constitutes the last

19 reasoned decision on the merits and is the subject of habeas review by this court.  See Ylst v.

20 Nunnemaker, 501 U.S. 797 (1991); Ortiz v. Yates, 704 F.3d 1026, 1034 (9th Cir. 2012).

21          The state appellate court analyzed the trial court's evidentiary rulings with respect to each

22 expert witness separately.  The relevant portion is reproduced below.

23

> We begin with the expert psychologist who would have testified
> regarding suicidal ideation among police officers.  [Petitioner]
> wanted to offer the testimony to negate a conclusion that his
> attempted suicide evidenced consciousness of guilt.  The prosecutor
> suggested in closing that petitioner's suicide attempt may have been
> fueled by guilt.  [Petitioner] claims the psychologist would have
> corroborated [petitioner]'s testimony that he tried to commit suicide
> not because of guilt but because of a sense of moral responsibility
> and because of other stressors.

24

25

26

27

28

The prosecution moved in limine to exclude the psychologist's testimony because the psychologist's expertise involved evaluating police officers for fitness following onduty shootings.   The trial court subsequently held a hearing without the jury to evaluate the proposed testimony.  (Evid. Code, § 402.)  The psychologist would have testified that a person can become suicidal after shooting someone, not necessarily as an acknowledgment of wrongdoing but from a feeling that they had responsibility or might have done something to prevent the tragedy.   The psychologist admitted he would be speculating about attempted suicide by former police officers and he had not evaluated [petitioner].

The trial court noted [petitioner] did not shoot anyone in the line of duty and the expert did not claim special knowledge about shootings by former officers or by persons engaged in domestic disputes.   The trial court excluded the expert testimony as not relevant and potentially confusing to the jury.

….

Contrary to [petitioner]'s argument, excluding the evidence did not deprive him of the ability to present a complete defense. [Petitioner] testified at length about his response to the shooting, saying it was "absolutely horrible" and "extremely traumatic" to have been "forced to shoot someone," calling it the most difficult thing he had been through in his life and the "straw that broke the camel[']s back" following a difficult three-year period where "everything had just come crashing down."   In closing, his lawyer argued that people commit suicide for a variety of reasons, including accidents, and emphasized that this was the "[f]irst time [petitioner] ever had to shoot somebody."     [Petitioner]'s explanation for his suicide attempt was presented to the jury even without the expert opinion.   There was no constitutional violation. (See *Crane v. Kentucky* (1986) 476 U.S. 683 [90 L.Ed.2d 636] [defining scope of constitutional right to present a defense].)

[Petitioner] cites *People v. Carter* (1957) 48 Cal.2d 737 for the proposition that testimony corroborating a defense is not cumulative. But here the trial court did not exclude the expert testimony because it was cumulative; it excluded the testimony because it was irrelevant and potentially confusing.  *Carter* does not assist [petitioner].

We turn next to the witness who served as a "range master" and who would have testified about firearms training for police officers. According to [petitioner], the range master could have described [petitioner]'s training and experience as a police officer, thereby corroborating [petitioner]'s testimony that a "combat-like" situation caused [petitioner] to shoot the victim in self-defense.  [Petitioner] claims that without the training testimony he was unable to present a complete defense, in violation of his constitutional rights.

The range master described himself as a former neighbor and close friend of [petitioner]'s.  He testified that he has been employed for almost 29 years as a police officer, serving as a firearms instructor,

a Special Weapons and Tactics (SWAT) team leader and a sniper, among other things. He described [petitioner] as extremely honest, a talented police officer who conducted himself as a professional both on duty and off duty, and a man who was not violent, but was logical, cautious and deliberate. He said he last saw [petitioner] about five years before trial (which was two years before the crime).

[Petitioner] wanted the range master to explain that police officers are trained to maintain self-control in hostile situations. [Petitioner] believed such testimony would help the jury determine whether his response to a perceived threat from the victim was reasonable. The trial court said expert evidence could not transform the "reasonable person" standard for self-defense to a "reasonable retired [police] officer" standard.

Nonetheless, the trial court allowed [petitioner] to describe his own training and experience at length and to explain why he thought he was defending himself. But the trial court ruled that corroboration by the range master would involve undue consumption of time and was not relevant because [petitioner] was not acting as a police officer when he shot the victim.

Revisiting the expert testimony issue when [petitioner] raised it a second time, the trial court observed that the reasonableness of [petitioner]'s subjective belief that he needed to defend himself was within the province of the jury. When [petitioner] raised the issue yet again in a motion for new trial, the trial court distinguished on duty shootings from "personal situation[s]" and stated that the testimony of the firearms expert could have led to confusion. Nonetheless, to address [petitioner]'s concerns, the trial court had ruled that [petitioner] could testify about his firearms training, and the expert testimony could come in on rebuttal if the prosecutor attacked [petitioner]'s credibility as to what he had been trained to observe; if the rebuttal testimony came in, the trial court had warned, it would be limited to the "very narrow issue" of [petitioner]'s actual belief about what he saw before he shot the victim. The trial court had instructed the jury with CALCRIM No. 571, informing them that the jury could find "[petitioner] acted in imperfect selfdefense if: [¶] 1. The [petitioner] actually believed that he was in imminent danger of being killed or suffering great bodily injury; [¶] AND [¶] 2. The [petitioner] actually believed that the immediate use of deadly force was necessary to defend against the danger; [¶] BUT [¶] 3. At least one of those beliefs was unreasonable."

[Petitioner] claims he had the right to offer the expert testimony in rebuttal because the prosecutor questioned him on cross-examination about how angry he was when his commands were not obeyed in the manner expected by a police officer. On direct examination, defense counsel asked about [petitioner]'s failure to follow police training by finding and securing the gun he allegedly

37

saw in the victim's hands.[17] During cross-examination, the prosecutor inquired about [petitioner]'s failure to offer medical aid to the wounded man, and about how well he could hear after the shooting. [Petitioner] subsequently argued the questions about his hearing "opened the door" for expert testimony to explain what happens in "combat-shooting situation[s]." The trial court ruled that combat-shooting testimony would not be relevant and would cause an undue consumption of the jury's time.

….

[Petitioner] claims that, without his friend's "primer on weapon-use training, behavioral training, and trained response techniques," he was deprived of his constitutional right to defend himself. To the contrary, the Constitution gives " 'wide latitude' " to trial judges to exclude evidence that is " 'only marginally relevant' " or would pose an undue risk of harassment, prejudice or confusion. (*Crane v. Kentucky*, *supra,* 476 U.S. at pp. 689-690 [90 L.Ed.2d at pp. 644-645].) There was no abuse of discretion.

4. <u>Objective Unreasonableness Under § 2254(d)</u>

The decision of the California Court of Appeal was not contrary to or an unreasonable application of clearly established Supreme Court precedent. The trial court did not apply the rules of evidence in a mechanistic fashion so as to defeat the presentation of petitioner's self-defense case. Nor is this a case in which evidence was excluded pursuant to a rule that infringed on a weighty interest of the accused and was arbitrary or disproportionate to the purposes it was meant to serve. See, e.g., <u>Rock v. Arkansas</u>, 483 U.S. 44, 58, 56 (1987). The state appellate court therefore reasonably concluded that there had been no constitutional violation. Accordingly, it is recommended that habeas relief be denied on this claim.

<u>CONCLUSION</u>

For all the reasons explained above, the state court's denial of Claim One was objectively unreasonable within the meaning of 28 U.S.C. § 2254(d). After conducting de novo review of this claim, the undersigned finds that trial counsel's failure to develop and present mental health evidence to support his self-defense claim constituted deficient performance and resulted in

---

[17] "Defendant responded to these questions by saying that he failed to look for a gun after the shooting because he saw no gun and because he would have done that "in the role as a police officer . . . [b]ut this is kind of different" and, if he had been acting as an officer, "[i]t would never have gotten to a shooting."

prejudice to petitioner.  See Strickland, 466 U.S. 668.  While the United States Supreme Court has emphasized, time and time again, that the standard for obtaining relief is designed to be difficult, it is not insurmountable.  See e.g., Harrington, 562 U.S. at 786.  Petitioner has demonstrated that he is entitled to relief even under the AEDPA's onerous standard.  The writ of habeas corpus should therefore issue on the grounds presented in Claim One.  Claims Two, Three and Four, however, should be denied for the reasons set forth above.

Accordingly, IT IS HEREBY ORDERED that petitioner's motion for a ruling (ECF No. 22) is GRANTED insofar as Findings and Recommendations have now issued.

IT IS FURTHER RECOMMENDED that:

1.  The petition for writ of habeas corpus (ECF No. 1) be GRANTED with respect to petitioner's claim that he received ineffective assistance of counsel based on the failure to investigate and present mental health evidence (Claim One), and OTHERWISE DENIED;

2.  Petitioner's conviction for first degree murder be vacated;

3.  Respondent be directed to release petitioner from custody unless the State of California commences a new trial within 60 days from the date judgment is entered.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. §636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  **No extensions of time to file objections will be granted in this case absent extraordinary circumstances.**  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 4, 2024

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

39